In the

# United States Court of Appeals

### For the Seventh Circuit

No. 11-2658

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

TYRON D. FREEMAN,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Central District of Illinois.
No. 09-CR-30033—**Richard Mills**, *Judge.*

ARGUED APRIL 2, 2012—DECIDED AUGUST 21, 2012

Before ROVNER, SYKES, and TINDER, *Circuit Judges.*

SYKES, *Circuit Judge.* Tyron Freeman and Brent Garner were caught in a sting operation set up by narcotics officers in Springfield, Illinois, using a couple of known drug associates working as cooperating informants. Freeman and Garner showed up at the appointed time and place for the undercover drug transaction in a minivan matching the description given by one of the informants. They remained at the scene for only a few

minutes, however. As they drove away, the police initiated a traffic stop. A search of the two men and the van did not turn up any drugs, but the police arrested them anyway. When Freeman was booked into the jail, he was strip-searched and found with a bag of crack cocaine concealed between his buttocks. He was convicted by a jury of possession of crack cocaine with intent to distribute and sentenced as a career drug offender to 30 years in prison.

On appeal Freeman challenges his arrest and the strip search at the jail, and also argues that his 30-year sentence is unreasonable. We reject these arguments and affirm. The police had credible information about Freeman's drug-trafficking habits from the cooperating informants, and his activities just prior to his arrest coincided perfectly with the details of the undercover operation, thus supplying probable cause to arrest despite the fact that no drugs were found in the search during the stop. And based on his criminal history, the specific grounds for his arrest, and his uncomfortable fidgeting in his seat while awaiting booking, there was adequate justification for a strip search before admitting him to the jail. Finally, Freeman's sentence, though lengthy, was at the bottom of the properly calculated guidelines range, and he has not given us any good reason to find it unreasonable.

## I. Background

In May 2008 a confidential informant told Springfield Police Officer Tammy Baehr about two drug

dealers—"Big D" and "Worm"—who drove around town in a silver minivan. The informant said he had traveled to Chicago with Big D on four occasions and that Big D had a habit of concealing drugs between his buttocks when he thought he might be stopped by police. The informant also said Big D was a diabetic and had recently been in the hospital because "[h]is leg was rotting off." Further investigation identified "Big D" as Tyron Freeman and "Worm" as Brent Garner.

Two months later, Springfield police arrested Terance Carter, another area drug dealer. In an attempt to obtain leniency, Carter offered to help the police with undercover transactions targeting other drug dealers, including one he knew only as "Banks." On July 24, 2008, at the direction of Officer James Cordery, Carter called Banks to arrange a drug purchase. A man with a raspy voice answered. (Carter later told Officer Cordery that he thought Banks was trying to disguise his voice because he did not normally talk that way.) Carter asked to buy six "eightballs"—six 3.5-gram quantities of crack cocaine—and suggested that they meet at a local liquor store to complete the transaction. The man with the raspy voice agreed, but the sale did not occur as planned because the seller did not show up at the meeting place.

Four days later, on July 28, 2008, Carter called Banks again and asked to purchase the same amount of crack. The raspy-voiced man answered, and this time he suggested that they rendezvous at the Sav-A-Lot store. Carter agreed. Officer Baehr and a DEA agent set up

surveillance outside the store. The parking lot was relatively empty, with only about five unoccupied cars. Twenty minutes after the first call, under the direction of Officer Cordery and DEA agents, Carter redialed Banks's phone and claimed to be waiting inside the store. The raspy-voiced man answered and said he would be there in two minutes.

Officer Baehr soon noticed a silver minivan pull into the lot and park near the store's door. She could see two black occupants in the van, one behind the wheel and the other sitting in the front passenger seat. The two occupants did not get out of the van. At Officer Cordery's direction, Carter called Banks's number again. The raspy-voiced man answered and said he was by the door. The silver minivan idled in front of the entrance for a few more minutes and then abruptly pulled out of the lot. Neither occupant had stepped out of the van.

Officer Baehr instructed uniformed officers on her surveillance team to follow and conduct a traffic stop. As the van drove away from the Sav-A-Lot, the driver failed to signal a turn. Officer John Shea initiated a stop about two blocks from the store. When Officer Baehr arrived at the scene, she heard the passenger—identified as Freeman—speaking with a "real raspy" voice. Another officer described Freeman's voice as "very rough and coarse, gravelly almost." The driver—identified as Garner—spoke with a normal voice. Freeman had a walking cast on his leg.

The officers searched Freeman and Garner but found no drugs. A canine unit arrived, and the dog alerted

when it circled the van. The officers then searched the van but again found no drugs. Carter, still with Officer Cordery and the DEA agents, was told to redial the number he had just used to set up the sting. He did so, and the call came through to a cell phone located in the armrest on the passenger-side door of the van, where Freeman had been sitting.

At this point the police officers had still not located any drugs, so Officer Baehr called a state prosecutor to discuss what to do. The prosecutor told her to arrest both men for attempted cocaine distribution. The officers placed Freeman and Garner under arrest and took them to the police station, and from there to the jail one block away. At the station one of the officers noticed that Freeman was visibly uncomfortable while seated; he "kept fidgeting and changing positions in the seat, back and forth from side to side." During the booking process at the jail, Freeman was strip-searched and found to be concealing a bag containing 31.8 grams of crack cocaine between his buttocks.

Freeman was charged with possession with intent to distribute 28 or more grams of crack cocaine. *See* 21 U.S.C. § 841(a)(1) & (b)(1)(B). The government later served notice that it would seek an enhanced sentence under 21 U.S.C. § 851 based on Freeman's prior drug offenses. Freeman moved to suppress the crack-cocaine evidence, arguing first that the police lacked probable cause to arrest, and second, that they lacked reasonable suspicion to conduct the strip search. The motion was heard by a magistrate judge, who credited the officers'

testimony recounting the facts we have just described. Freeman did not testify. The magistrate judge concluded that both the arrest and the strip search were justified. He explained that at the time Freeman was arrested, the "officers had overheard the six phone calls placed by Carter, which . . . clearly attempt to set up a drug transaction." They had also observed the silver van and its occupants engage in behavior uniquely consistent with the planned drug sale. And once the officers stopped the van for traffic violations, they noticed that Freeman had a raspy voice, just like the man Carter had called to arrange the sale.

The magistrate judge further concluded that even if the foregoing facts "did not rise to the level of probable cause," the information known to the officers "quickly blossomed to that level as the stop progressed." By the time the officers arrested Freeman, they had two additional pieces of information: (1) the drug dog had alerted on the van; and (2) when Carter redialed the number he had been using to set up the sting, the call came through to a phone located on the front-passenger side of the van. The judge held that these facts, considered together, established probable cause to arrest Freeman for attempted distribution of cocaine.

With respect to the strip search at the jail, the magistrate judge explained that circuit precedent allows warrantless strip searches of pretrial detainees if jail officials have reasonable suspicion at the time of the search that the individual might be concealing contraband. *See Kraushaar v. Flanigan*, 45 F.3d 1040, 1045 (7th

Cir. 1995). The judge concluded that in Freeman's case, there were many grounds for suspicion, including strong evidence connecting him to a narcotics-trafficking offense, the inability of the officers to find drugs at the scene of the stop, his known history of concealing drugs between his buttocks, and his obvious discomfort and suspicious fidgeting while seated at the police station.

The district court adopted the magistrate judge's recommendation and denied Freeman's motion to suppress. A jury found Freeman guilty, and at sentencing the district court classified Freeman as a career drug offender based on convictions in 1999 and 2005 for distributing narcotics. *See* U.S.S.G. § 4B1.1(b). With an offense level of 37 and a criminal history category of VI, Freeman's advisory guidelines range was 360 months to life with a mandatory minimum sentence of ten years. Freeman argued for a below-guidelines sentence primarily because his 2005 conviction involved less than one gram of cocaine. The judge rejected this argument, noting that this was Freeman's fifth drug-related conviction and third drug-trafficking crime:

> In 1993, at the age of 17, the defendant was first convicted of possessing cocaine. Since then he has been convicted multiple times for serious drug offenses.
>
> . . . .
>
> Mr. Freeman has steadily become involved in more serious drug crimes and he has not performed well while on probation or parole. When he's been given probation on drug charges[,] he's often failed to

comply with the restrictions and has been sent to a state prison. When he's been paroled, he subsequently violated parole, usually because of a new drug offense. The result is a revolving door between drug dealing and imprisonment. Each time the penalties are enhanced, but the defendant returns to the same patterns of dealing drugs.

Today that revolving door is stopped. While I've considered all of the factors set forth in [§] 3553, one factor that is especially relevant, the need for the sentence imposed to protect the public from further crimes of the defendant. The risk of recidivism is extremely high in this case. And I conclude that Mr. Freeman must be incapacitated. If he cannot stop himself from being a drug dealer, he must be removed from society so that he cannot re-offend.

The judge imposed a sentence of 360 months, the bottom of the guidelines range. This appeal followed.

## II. Discussion

Freeman challenges the district court's denial of his suppression motion, reiterating his arguments that the police lacked probable cause to arrest him and that the strip search was not supported by reasonable suspicion. He also argues that his 30-year sentence is substantively unreasonable mainly because one of his prior drug-trafficking offenses involved only a small amount of cocaine.

## A. Probable Cause for the Arrest

We review the district court's denial of Freeman's suppression motion under a dual standard of review: Factual findings are reviewed for clear error and legal conclusions get independent review. *See United States v. Huebner*, 356 F.3d 807, 812-13 (7th Cir. 2004). The district court's credibility determinations are not clearly erroneous unless "completely without foundation." *Id.* at 812 (quotation marks omitted).

A warrantless arrest satisfies the Fourth Amendment if supported by probable cause that the arrested individual committed a crime. *Maryland v. Pringle*, 540 U.S. 366, 370 (2003). "Whether probable cause exists depends upon the reasonable conclusion to be drawn from the facts known to the arresting officer at the time of the arrest." *Devenpeck v. Alford*, 543 U.S. 146, 152 (2004). Probable cause exists when officers have "a reasonable ground for belief of guilt." *Pringle*, 540 U.S. at 371 (quotation marks omitted). This standard "requires only a probability or substantial chance of criminal activity, not an actual showing of such activity." *United States v. Hicks*, 650 F.3d 1058, 1065 (7th Cir. 2011) (internal quotation marks omitted).

At the time of Freeman's arrest, the police on the scene had plenty of information to give them probable cause to believe that he had committed the crime of attempted distribution of cocaine. Officer Baehr had just watched the silver van pull into the Sav-A-Lot parking lot at precisely the time the planned drug deal was supposed to occur, and the van was the only

occupied vehicle in the lot. *Cf. United States v. Colon*, 549 F.3d 565, 567 (7th Cir. 2008) (finding probable cause to arrest an individual for purchasing drugs when he "arrived when . . . the buyer would arrive, and during the preceding 15 minutes no one else had entered the house from the street"). The van matched the description provided by the first confidential informant. Just before the van arrived, Carter, the cooperating informant who worked with the police to set up the sting, called Banks's number to say that he was in the store; the raspy-voiced man on the other end said he would be there in two minutes. When Carter called again to say he was ready to make the exchange, the raspy-voiced man said he was at the Sav-A-Lot near the door—exactly where the silver van was parked. And when Carter did not immediately show up, the van pulled away. The occupants never got out of the van or took any other action to suggest that they were there on legitimate business.

Once the traffic stop was underway, Officer Baehr heard Freeman speaking in a raspy voice, just like the man with whom Carter had arranged the sale. He was also wearing a walking cast on his leg, matching the information Officer Baehr had from the first confidential informant that Big D had diabetes and had recently been in the hospital because his leg was "rotting." Finally, when Carter redialed the number he had been using to set up the sting, the call came through on a phone in the van; the phone was located in an armrest on the front passenger side, exactly where Freeman—the suspect with the raspy voice—had been sitting.

These facts easily establish probable cause to believe that the two occupants of the van came to the Sav-A-Lot in response to the sting; that is, they were there to sell cocaine to Carter, who had just arranged for this illicit transaction to occur at that very time and place.

Freeman insists that the arresting officers did not have probable cause to arrest him because he was only a passenger in the van. *Cf. United States v. Ingrao*, 897 F.2d 860, 863 (7th Cir. 1990) ("[P]hysical proximity to a suspected crime, without other indicia of [the defendant's] involvement, is insufficient to support a finding of probable cause."). This argument totally misses the mark. Freeman's status as the passenger in the car makes no difference. *See Wyoming v. Houghton*, 526 U.S. 295, 304 (1999) ("[A] car passenger . . . will often be engaged in a common enterprise with the driver . . . ."); *Pringle*, 540 U.S. at 372 (finding probable cause to arrest car passengers because police officers reasonably inferred that "any or all three of the occupants had knowledge of, and exercised dominion and control over, the cocaine"). His presence in the car under these circumstances—and his raspy voice, matching the voice of the drug dealer on the phone—provided the officers with all the particularized reasons they needed to believe that Freeman, though a passenger, was involved in the attempted drug sale.

Freeman also attacks Officer Baehr's credibility, but this argument is a nonstarter. A district court's credibility assessment based on live testimony "will not be disturbed unless it is completely without foundation."

*Huebner*, 356 F.3d at 812 (quotation marks omitted). Freeman critiques Officer Baehr's testimony on several grounds, but none gives us reason to overturn the magistrate judge's decision to credit her as a witness. First, Freeman points to small inconsistencies in Officer Baehr's testimony—notably her statements that the first confidential informant told her that Freeman had hidden drugs between his buttocks "one time" and "from time to time." Minor inconsistencies like this do not justify reversal. "Testimony is not incredible as a matter of law . . . only because the witness may have been impeached by certain discrepancies in [her] story, by prior inconsistent statements, or by the existence of a motive to provide evidence favorable to the government." *United States v. Alcantar*, 83 F.3d 185, 189 (7th Cir. 1996). The most important aspects of Officer Baehr's testimony were internally consistent.

Second, Freeman argues that Officer Baehr must have lied because she testified about details that did not appear in her police report. This argument mistakes the purpose of a police report, which "is not an all-encompassing account of exactly what was said and done during an encounter between a law enforcement agent and a private citizen, but rather is a summary of what occurred." *United States v. Eddy*, 8 F.3d 577, 582 (7th Cir. 1993). More importantly, this kind of argument is for the factfinder, not a reviewing court. "The absence of any indication in the police report . . . may impact the credibility of the officers' testimony, but . . . we will not disturb the district court's factual finding that such testimony was credible."

*United States v. Evans*, 994 F.2d 317, 321-22 (7th Cir. 1993); *see also United States v. Briggs*, 291 F.3d 958, 963 (7th Cir. 2002).

Finally, Freeman argues that Officer Baehr must have fabricated her testimony because otherwise she would not have called a state prosecutor when the officers failed to find any drugs at the scene. We disagree. Police officers do not need to make an arrest every time they have probable cause, and a "drugless" drug bust is the type of case a prosecutor may not want to pursue even when the officers have probable cause to arrest. Officer Baehr's decision to contact the prosecutor does not call into question the presence of probable cause.

## B. The Strip Search

Freeman argues that the strip search at the jail violated his Fourth Amendment rights. We review this claim de novo. *United States v. Brack*, 188 F.3d 748, 758 (7th Cir. 1999). We have held that jail officials must have reasonable suspicion that a detainee is concealing contraband before they may conduct a strip search, and whether reasonable suspicion exists "depends upon such factors as the nature of the offense, the arrestee's appearance and conduct, and the prior arrest record." *Kraushaar*, 45 F.3d at 1045 (internal quotation marks omitted). Sometimes the nature of the charged offense by itself may supply enough suspicion to justify the search, *see Weber v. Dell*, 804 F.2d 796, 802 (2d Cir. 1986), and narcotics violations are the "kinds of crimes . . . that might give rise to a reasonable belief that [an] arrestee

was concealing an item in a body cavity," *Mary Beth G. v. City of Chicago*, 723 F.2d 1263, 1273 (7th Cir. 1983).[1] The inquiry therefore recognizes that "[a] detention facility is a unique place fraught with serious security dangers. Smuggling of money, drugs, weapons, and other contraband is all too common an occurrence." *Bell v. Wolfish*, 441 U.S. 520, 559 (1979).

Here, the strip search was amply justified. First, Freeman was arrested for attempted drug distribution, which is exactly the type of crime that raises reasonable suspicion of concealed contraband. *See Mary Beth G.*, 723 F.3d at 1273; *Bull v. City & County of San Francisco*, 595 F.3d 964, 988-89 (9th Cir. 2010) (en banc) (Graber, J., concurring) ("[S]*ome* categories of pretrial detainees (such as those with a criminal record and those arrested for violent offenses and drug offenses) do pose a significant risk of bringing contraband into the jail."). The officers knew of Freeman's habit of hiding drugs

---

[1] The Supreme Court recently addressed the legality of a policy of strip searches prior to a detainee's admission to jail. *See Florence v. Bd. of Chosen Freeholders of Cnty. of Burlington*, 132 S. Ct. 1510 (2012). The Court explained that when a jail has a policy of strip-searching each of its inmates before admittance, "deference must be given to the officials in charge of the jail unless there is 'substantial evidence' demonstrating their response to the situation is exaggerated." *Id.* at 1518 (quoting *Block v. Rutherford*, 468 U.S. 576, 584 (1984)). *Florence* may require reconsideration of some aspects of our circuit's caselaw, but there is no need to do so here; the strip search in this case was well-supported by particularized suspicion.

between his buttocks, and when they failed to find drugs at the scene of the traffic stop, it was completely reasonable to think that he might be concealing drugs in this way. Finally, there was Freeman's telltale uncomfortable fidgeting while seated at the police station. This evidence gave the officers particularized grounds for suspecting that Freeman might be hiding drugs or contraband and that a strip search was warranted. *Cf. Kraushaar*, 45 F.3d at 1045-46 (finding reasonable suspicion based on a detainee's furtive hand movements suggesting he was trying to hide something in his pants).

Freeman complains that the police reports did not mention his history of concealing drugs or his suspicious fidgeting. We have already explained that this is an argument for the factfinder, not a reason for us to overturn the district court's credibility determination; as a general matter, this kind of attack does not warrant reversal on appeal. *See Eddy*, 8 F.3d at 582; *Evans*, 994 F.2d at 321-22; *Briggs*, 291 F.3d at 963. It was up to the magistrate judge to decide whether to credit the officers' testimony about Freeman's fidgeting and his history of concealing drugs even though these details were not in their reports. We see no reason to disturb the judge's credibility determination.

Even setting aside these additional facts, Freeman was under arrest for attempted cocaine distribution, a drug dog had alerted to the presence of drugs at the scene of the stop but no drugs were found, and the officers knew he was at the Sav-A-Lot trying to sell six eightballs of cocaine. These facts, combined with his

history of drug crimes, was enough to justify the strip search before booking him into the jail.

## C.  Reasonableness of the Sentence

Finally, Freeman challenges his 30-year sentence as substantively unreasonable. "A sentence is reasonable if the district court gives meaningful consideration to the factors enumerated in 18 U.S.C. § 3553(a), including the advisory sentencing guidelines, and arrives at a sentence that is objectively reasonable in light of the statutory factors and the individual circumstances of the case." *United States v. Shannon*, 518 F.3d 494, 496 (7th Cir. 2008). Although the sentencing judge is free to disagree with the policy judgments underlying the guidelines, the judge is not required to do so. *United States v. Corner*, 598 F.3d 411, 416 (7th Cir. 2010) (en banc). We review the substantive reasonableness of a sentence deferentially, for abuse of discretion, and presume that a within-guidelines sentence is reasonable. *United States v. Garcia*, 580 F.3d 528, 540 (7th Cir. 2009).

Freeman concedes that the district court properly calculated the guidelines range and that his sentence is within it, but he maintains that 360 months is an unreasonably long sentence under the circumstances because: (1) he was a "small time, small quantity" dealer and not a "repeat drug trafficker," in that one of his two prior trafficking offenses involved less than one gram of cocaine; (2) career-offender enhancements dispropor-

tionately affect black offenders; and (3) career-offender enhancements do not reduce recidivism.

These arguments, individually or together, are insufficient to overcome the appellate presumption that Freeman's within-guidelines sentence is reasonable. The district court thoroughly considered Freeman's arguments as well as the relevant § 3553(a) factors. The judge noted that Freeman had "steadily become involved in more serious drug crimes" since his first drug conviction at age seventeen and that he had failed to comply with restrictions while on both probation and parole. The judge also determined that Freeman's persistent involvement in narcotics trafficking was more important than the small quantity of cocaine involved in his 2005 conviction. The judge ultimately concluded that Freeman's unbroken criminal history warranted the lengthy incapacitation called for by the advisory guidelines. While severe, the 30-year sentence follows the policy judgments underpinning the guidelines; the judge was permitted—but not required—to disagree with those policy judgments. We see no compelling reason to overturn the district court's presumptively reasonable sentence.

AFFIRMED