In the

# United States Court of Appeals

## For the Seventh Circuit

———————————

No. 19-2698

SHARON LYNN BROWN,

*Plaintiff-Appellant,*

*v.*

POLK COUNTY, WISCONSIN, *et al.*,

*Defendants-Appellees.*

———————————

Appeal from the United States District Court for the
Western District of Wisconsin.
No. 3:18-cv-391 — **William M. Conley**, *Judge*.

———————————

ARGUED APRIL 28, 2020 — DECIDED JULY 13, 2020

———————————

Before EASTERBROOK, RIPPLE, and SCUDDER, *Circuit Judges.*

SCUDDER, *Circuit Judge.* Sharon Brown was a detainee at the Polk County Jail who underwent a physical search of her body cavities. The institution had a written policy authorizing such a search to be conducted by medical personnel when there was reasonable suspicion to believe an inmate was internally hiding contraband. Fellow inmates had reported that Brown was concealing methamphetamine inside her body, and that prompted jail staff to invoke the policy. Officers took

Brown to a hospital, where a doctor and nurse inspected both her vagina and rectum. The search revealed no drugs.

Brown sued Polk County and several jail officials under 42 U.S.C. § 1983 alleging a violation of her Fourth Amendment rights. The defendants moved for summary judgment, and the district court granted the motion, concluding that the defendants had reasonable suspicion that Brown was concealing contraband, their suspicion justified the cavity search, and the ensuing search was reasonable. We agree and affirm.

# I

Sharon Brown landed in the Polk County Jail in May 2017 after an arrest for shoplifting. The record does not reveal whether a judge ordered the detention or whether Brown was held while awaiting an initial presentment in court. The next day, Jacqueline Duke, an inmate who shared her housing unit, told Correctional Officer Steve Hilleshiem that Brown was hiding "a large amount" of methamphetamine in a body cavity. Officer Hilleshiem had little background information—he did not know Duke or Brown, what either inmate was in for, or whether they had any relationship—but he relayed the allegation to Nurse Donna Johnson, who was more familiar with Duke.

Nurse Johnson's prior dealings with Duke had left her untrusting of her word, so she decided to consult Amy Nelson, who she considered to be a more reliable inmate living in the unit. Nelson corroborated Duke's accusation with more detail. She said Brown had told other inmates that she was hiding between a quarter gram and an "eight ball"—which amounts to about 3.5 grams—of methamphetamine inside her body. According to Nelson, the drugs were not sealed

properly, so Brown had been looking for somewhere else to hide them. Nelson further reported that she had seen Brown use the bathroom multiple times and that other inmates were worried.

Nurse Johnson discussed the situation with Officer Hilleshiem and other staff members, and the group collectively decided to request a cavity search. Polk County has a policy that allows a detainee's body cavities to be searched when an officer has "reasonable grounds to believe that the person is concealing weapons, contraband, or evidence in a body cavity, or otherwise believes that the safety and security of the jail would benefit from a body cavity search." The policy defines "body cavity search" as "an inspection and penetration of the anal or vaginal cavity of a person that is conducted manually, by means of an instrument," or "in any other manner." It further provides that the search must "be performed only by medical personnel licensed in the State of Wisconsin." Officer Hilleshiem contacted Chief Deputy Wes Revels, the jail's administrator, for approval and expressed his view that officials had gathered enough evidence to justify a search under the policy. Based on those representations, Chief Deputy Revels authorized the search.

Officers took Brown to a local hospital, where a doctor and nurse performed the search in a private room without any officers present. The doctor first administered an ultrasound of Brown's abdomen. The procedure revealed no contraband. He then conducted a vaginal exam by inserting a speculum to spread and hold open the vaginal walls to see inside. This exam was brief and similar to a routine pelvic exam or a pap smear. The rectal exam began in much the same manner—the doctor used a speculum to widen the anus and peer inside.

But during the procedure, the doctor's headlamp failed. With the speculum remaining in her anus, Brown had to wait while the doctor looked for an alternate light source. In the end, the search yielded no contraband.

The parties dispute how long these exams lasted. Brown testified that the ultrasound took about five minutes and the vaginal exam "didn't take long at all." As for the rectal exam, Brown did not say how long it lasted but explained that when the doctor's headlamp failed, "it seemed like it took forever for them to find a light that worked." For their part, the defendants point to the testimony of a police officer who transported Brown from the jail to the hospital. He estimated that "under a minute" elapsed between the time the medical personnel entered the room and when Brown left.

Brown sued the County, Officer Hilleshiem, and Chief Deputy Revels. She contended that the Fourth Amendment requires jail officials to get a warrant based on probable cause before ordering a body cavity search and that the defendants' failure to do so violated her constitutional rights. And because the jail's express policy permitted that practice, she sought to hold the County liable under *Monell v. Department of Social Services*, 436 U.S. 658 (1978).

The defendants successfully moved for summary judgment. The district court concluded that the Fourth Amendment requires reasonable suspicion to justify the kind of search Brown underwent and that the officers had just that. The court also found the search to have been conducted reasonably, as it was performed by medical professionals in a private, hygienic location and lasted only a short time. Finding no constitutional violation, the court concluded that the *Monell* claim failed too.

Brown now appeals.

## II

Incarceration curbs constitutional protections but it does not extinguish them. See *Turner v. Safley*, 482 U.S. 78, 84 (1987). Among a pretrial detainee's retained but limited rights is the Fourth Amendment's guarantee of "[t]he right of the people to be secure in their persons . . . against unreasonable searches and seizures." The inspection of Brown's body cavities was a search to which the Fourth Amendment applies, and the defendants are wise to leave that undisputed. See *Florence v. Bd. of Chosen Freeholders of County of Burlington*, 566 U.S. 318 (2012) (applying the Fourth Amendment to a strip search of a pretrial detainee).

But the Fourth Amendment does not prohibit all searches, only unreasonable ones. See *Maryland v. King*, 569 U.S. 435, 446–47 (2013). We evaluate reasonableness by balancing "the need for the particular search against the invasion of personal rights that the search entails." *Bell v. Wolfish*, 441 U.S. 520, 559 (1979). In doing so, we consider "the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted." *Id.*

Summary judgment is appropriate only if the defendants have shown that no material facts are in dispute and they are entitled to judgment as a matter of law. See FED. R. CIV. P. 56(a). We review *de novo* the district court's grant of summary judgment, viewing all facts in the light most favorable to Brown and drawing all reasonable inferences in her favor. See *Hackett v. City of S. Bend*, 956 F.3d 504, 507 (7th Cir. 2020).

A

Our usual starting point for the reasonableness inquiry is whether government officials had "some quantum of individualized suspicion" necessary to justify the search. *King*, 569 U.S. at 447 (quoting *United States v. Martinez–Fuerte*, 428 U.S. 543, 560–61 (1976)). But individualized suspicion is not an "irreducible" constitutional mandate. *Id*. Suspicionless searches are permitted in limited circumstances, like when they serve "special needs, beyond the normal need for law enforcement." *City of Indianapolis v. Edmond*, 531 U.S. 32, 37 (2000). Indeed, twice the Supreme Court has confronted circumstances under which the special context of a jail—with the unique challenges it presents—allows for suspicionless searches of pretrial detainees' body cavities.

In *Bell v. Wolfish*, the Court upheld the constitutionality of a jail policy requiring all inmates to undergo a strip search, including a visual examination of their body cavities, every time they returned from a contact visit. 441 U.S. at 558–60. In so holding, the Court emphasized the government's interest in performing such searches, observing that "[a] detention facility is a unique place fraught with serious security dangers" and "[s]muggling of money, drugs, weapons, and other contraband is all too common an occurrence." *Id*. at 559. Even pitted against the significant privacy invasion that these searches posed to the inmates, the gravity of the jail's security interests nevertheless tipped the scale away from a particularized suspicion requirement and instead counseled in favor of a broader, categorical rule authorizing visual strip searches following contact visits. See *id*. at 560.

The Supreme Court reinforced this holding in *Florence v. Board of Chosen Freeholders of the County of Burlington*, rejecting

a Fourth Amendment challenge to a jail policy that authorized an invasive search, which again included visual inspections of body openings, during the intake process for pretrial detainees. 566 U.S. at 324, 339. In *Florence*, too, the Court underscored the acute threat of contraband in the jail setting. See *id*. at 332–34 (explaining how drugs can embolden aggression, contraband can be used as underground currency, and prohibited items can become weapons). It therefore concluded that the search procedure "struck a reasonable balance between inmate privacy and the needs of the institutions." *Id*. at 339.

The search in this case does not similarly belong in the "closely guarded category of constitutionally permissible suspicionless searches." *Chandler v. Miller*, 520 U.S. 305, 309 (1997). In no way do *Bell* and *Florence* declare detainees' bodies open for search at any time and under any circumstance. Nor do the defendants urge the adoption of any new broad rule authorizing searches of pretrial detainees. Put another way, the "touchstone" of the controlling Fourth Amendment inquiry remains reasonableness. *King*, 569 U.S. at 448. And in the circumstances before us here, reasonableness requires a finding of particularized suspicion.

A core purpose of the Fourth Amendment's reasonableness standard is to constrain government officials' discretion and thus "safeguard the privacy and security of individuals against arbitrary invasions." See *Delaware v. Prouse*, 440 U.S. 648, 654 (1979) (citations omitted). The searches at issue in *Bell* and *Florence* concerned policies that applied broadly to all detainees following contact visits and upon their entry into a facility. See 441 U.S. at 558 (evaluating a policy subjecting inmates to strip search "after every contact visit with a person

from outside the institution"); 566 U.S. 318 at 324 (considering a policy making "all arriving detainees" subject to search). That general applicability both advanced important institutional interests (of preventing contraband) and protected the inmates from being singled out for a search at the whim of a guard, even without the safeguard of an individualized suspicion requirement. See *King*, 569 U.S. at 447–48 (explaining that there is no need for individualized suspicion where "all arrestees" were subject to the search).

Brown was not searched as part of a practice that applied to everyone housed in the Polk County Jail. She alone was selected for a search, and a quite invasive one at that. In these circumstances, the search must be supported by reasonable suspicion. See *New Jersey v. T.L.O.*, 469 U.S. 325, 342 n.8 (1985) ("Exceptions to the requirement of individualized suspicion are generally appropriate only where the privacy interests implicated by a search are minimal and where other safeguards are available to assure that the individual's reasonable expectation of privacy is not subject to the discretion of the official in the field." (internal quotation marks omitted)). That conclusion finds corroboration in some of our prior cases that have required reasonable suspicion for individualized visual strip searches conducted after an arrest or during the booking process. See *United States v. Freeman*, 691 F.3d 893, 901 (7th Cir. 2012); *Kraushaar v. Flanigan*, 45 F.3d 1040, 1045 (7th Cir. 1995).

Brown would have us adopt a higher standard of suspicion and require a warrant based on probable cause. For support, she points to *Schmerber v. California*, 384 U.S. 757 (1966) and *Winston v. Lee*, 470 U.S. 753 (1985), cases addressing physical—as opposed to visual—searches of people's bodies undertaken to obtain evidence. *Schmerber* involved a warrantless

blood draw performed on a hospitalized man who had just been arrested for driving while intoxicated, see 384 U.S. at 758–59, and *Winston* concerned a surgery to retrieve a bullet from a detainee's body to be used as evidence in a prosecution for robbery, see 470 U.S. at 755. Neither implicated jail security, the interest that weighs so heavily in the balance of the search here.

*Bell* and *Florence* underscore the necessity of a jail's ability to search those under its care for contraband, for the protection of all within its walls. Our conclusion that the precise searches at issue in those cases differ from the one here in the scope of discretion does not in any way undermine the importance of these interests. They apply with equal force and distinguish Brown's search from the ones in *Schmerber* and *Winston*. A search conducted for the safety of the jail is one that furthers special needs beyond the normal need for law enforcement, and "the public interest is such that neither a warrant nor probable cause is required." *King*, 569 U.S. at 447 (quoting *Maryland v. Buie*, 494 U.S. 325, 331 (1990)).

Brown correctly observes that the search she underwent was more invasive because it was not just visual but also involved a physical intrusion into the most private parts of her body. No doubt she is right on that score. But given the heft of the security interest at stake, the invasion to her privacy was not so much greater that it pushes the threshold suspicion requirement into probable cause. The Fourth Amendment required Polk County jail officials to have only reasonable suspicion that she had concealed contraband inside her body before moving forward with the search.

And they did. Officer Hilleshiem and Chief Deputy Revels relied on tips from both inmates Duke and Nelson, and a

credible tip from a reliable informant can support reasonable suspicion. See *Adams v. Williams*, 407 U.S. 143, 146–47 (1972). Nelson's information in particular bore several signs of reliability—Nurse Johnson considered her to be credible and her account was detailed, based on firsthand observations, and recounted recent events. See *United States v. Cherry*, 920 F.3d 1126, 1133–34 (7th Cir. 2019). Chief Deputy Revels authorized the search in reliance on Officer Hilleshiem's representation that the evidence was sufficient to support a search under the County's policy, so the collective-knowledge doctrine imputes knowledge of the reported information to him. See *United States v. Williams*, 627 F.3d 247, 252 (7th Cir. 2010). This leaves no issue of fact as to the existence of reasonable suspicion.

B

The inquiry does not end there. That the defendants met the requisite level of individualized suspicion is just one component of the search's reasonableness. We must go on to consider the scope of the search, the manner in which it was conducted, and the place in which it occurred. See *Bell*, 441 U.S. at 559. "Urgent government interests are not a license for indiscriminate police behavior." *King*, 569 U.S. at 448.

We strain to conceive of a search more invasive than the one performed on Brown. Even a visual scan of a bare body is an extraordinary interference with privacy. See *Bell*, 441 U.S. at 558–60; *Tinetti v. Wittke*, 479 F. Supp. 486, 491 (E.D. Wis. 1979), *aff'd and adopted*, 620 F.2d 160, 160–61 (7th Cir. 1980) (describing "the visual inspection of the anal and genital areas" as "demeaning, dehumanizing, undignified, humiliating, terrifying, unpleasant, embarrassing, repulsive, signifying degradation and submission"). In Brown's case, it was not only

someone visually inspecting her naked body and closely ex-
amining the most private parts but someone who did so by
making physical contact, prying open her vagina and anus.

A privacy invasion of that magnitude must be carried out
with careful attention to limiting its scope and minimizing the
intrusion. The defendants did that. The search was performed
pursuant to a written policy with defined procedures that re-
quired reasonable suspicion and approval from the jail's chief
deputy. So, too, was it conducted in a medical setting by li-
censed medical professionals. See *Sanchez v. Pereira-Castillo*,
590 F.3d 31, 44 (1st Cir. 2009) (observing that doctors conduct-
ing search in a hygienic setting weighed in favor of reasona-
bleness). And Brown was afforded some measure of privacy,
undergoing the search outside the presence of any officers. Cf.
*Campbell v. Miller*, 499 F.3d 711, 718 (7th Cir. 2007) (finding
unreasonable a strip search where "the police inexplicably
did not even afford [the arrestee] the dignity of doing it in a
private place").

The search was also completed within a reasonable
timeframe. By Brown's own account, the ultrasound and vag-
inal exam proceeded swiftly. The untimely failure of the doc-
tor's headlamp added some length to the ordeal, minutes that
surely felt like an eternity to Brown. But the accidental delay
cannot be attributed to the defendants. And the only evidence
we have of the total duration of the search, all exams com-
bined, comes from the transporting officer, who testified that
it was very brief.

With these observations, we do not prescribe constitu-
tional mandates or minimums. Other cases are sure to present
different facts showing different levels of care—in some cases
more, in others less—taken by jail officials in authorizing and

executing a challenged search. The reasonableness inquiry is fact intensive. For today's case we conclude no more than that the factors present here would leave a rational jury with no option but to find the search reasonable.

### III

Nobody disputes the invasiveness of the search that Brown underwent. Her body was laid bare not just for visual inspection but for physical prodding, an intrusion of privacy to the highest degree. Her incarcerated status did not strip her of the Fourth Amendment's protection. Nor, however, does the Fourth Amendment ignore the realities of the jail setting and its attendant security risks. The balance of the intrusion to Brown and the weight of jail safety concerns comes out to a requirement of reasonable suspicion to justify the search. A rational jury could reach no other conclusion than that the defendants complied with the threshold suspicion requirement and executed the search reasonably, meaning there was no constitutional violation. That finding defeats the *Monell* claim too. See *Hall v. City of Chi.*, 953 F.3d 945, 955 (7th Cir. 2020).

For these reasons, we AFFIRM.