# SUPREME COURT OF THE UNITED STATES

## SHARON LYNN BROWN *v.* POLK COUNTY, WISCONSIN, ET AL.

### ON PETITION FOR WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SEVENTH CIRCUIT

No. 20–982.   Decided April 19, 2021

The petition for a writ of certiorari is denied. JUSTICE BARRETT took no part in the consideration or decision of this petition.

Statement of JUSTICE SOTOMAYOR respecting the denial of certiorari.

Petitioner Sharon Lynn Brown asks this Court to decide what degree of suspicion the Fourth Amendment requires to justify the physically penetrative cavity search of a pretrial detainee. While Brown was in pretrial detention, officials at Polk County Jail directed a male doctor to insert a speculum into her vagina, spread it open, and shine a flashlight inside to search for contraband. The doctor did the same to Brown's anus. The Court of Appeals for the Seventh Circuit held that mere reasonable suspicion justified this search. That is, for example, the same degree of suspicion required for police to stop someone on the street and ask a few, brief questions. See *Terry* v. *Ohio*, 392 U. S. 1, 21–22 (1968). Brown argues this much more invasive search required probable cause and a warrant or exigent circumstances. Those are, by comparison, the same prerequisites for police to draw blood from an unconscious motorist to determine his blood alcohol content. See *Mitchell* v. *Wisconsin*, 588 U. S. ___, ___ (2019) (slip op., at 16).

This petition raises an important question. Nonetheless, I agree with the Court's decision to deny certiorari, as "further consideration of the substantive and procedural ramifications of the problem by other courts will enable us to

deal with the issue more wisely at a later date." *McCray* v. *New York*, 461 U. S. 961, 962 (1983) (Stevens, J., statement respecting denial of certiorari).

It bears emphasis, however, that the degree of suspicion required for a search should be substantially informed by the availability of less intrusive alternatives. This Court does not lightly permit an entire category of warrantless, invasive searches when less offensive options exist. Particularly searches of those who have not been convicted of any crime. The courts below considered no such alternatives before holding that reasonable suspicion alone justified this degrading search into Brown's vagina and anus. Future courts presumably will not do the same.

I

In May 2017, police arrested Brown for shoplifting and took her to Wisconsin's Polk County Jail. The jail's written policy at the time permitted officials to direct medical personnel to perform "an inspection and penetration of the anal or vaginal cavity . . . by means of an instrument, apparatus, or object, or in any other manner" whenever they had "reasonable grounds" to believe a detainee was concealing "weapons, contraband, or evidence," or otherwise "believe[d] that the safety and security of the jail would benefit" from such a search. Electronic Case Filing in No. 3:18–cv–00391 (WD Wis.), Doc. 12–1, pp. 1, 6 (ECF). At least one correctional officer, respondent Steven Hilleshiem, sought permission for penetrative vaginal and anal searches "any time one inmate sa[id] another inmate ha[d] contraband on their person in a body cavity." ECF Doc. 14, p. 6, Tr. 19. He generally would not investigate the tipster's source, determine her reputation for honesty, or seek any other indicia of reliability. *Id.,* at 5–6, Tr. 17–19. In his view, the tip alone provided "reasonable grounds." *Id.,* at 7, Tr. 23. The jail administrator, respondent Wes Revels, similarly needed only Hilleshiem's word to approve a search. ECF

Doc. 19, pp. 7–8, Tr. 22–23, 26–28.

A day after Brown's arrest, two inmates told jail staff that Brown was hiding drugs in her body. Hilleshiem contacted Revels, who authorized a cavity search.[1] Brown was taken to the hospital, where a male doctor performed an ultrasound that revealed no foreign objects. The doctor then inserted a speculum into her vagina, spread open the vaginal walls, and shined his headlamp inside. He did the same to her anus. He found no contraband.

Brown testified that, when the doctor removed the speculum from her anus, "I immediately started crying. I couldn't stop. I cried myself to sleep. I cried all the way back to the jail. I cried the whole time I was getting dressed." ECF Doc. 17, p. 32, Tr. 121. When she returned to the jail, she "asked to stay in the holding cell because [she] couldn't quit crying." *Ibid.,* Tr. 124. This trauma left Brown with anxiety and depression. She slept just three hours a night. *Id.,* at 15, Tr. 55. She experienced flashbacks and feared leaving the house, terrified the police would pull her over and send her back to jail. *Id.,* at 15, Tr. 53; *id.,* at Tr. 62–63. Nearly two years later, Brown was still afraid of being alone in a room with a man. Even her own brother. *Id.,* at 16–17, Tr. 59–61.

Brown sued Polk County, Hilleshiem, Revels, and others, alleging that they violated her Fourth Amendment right to be free from unreasonable searches. The District Court granted respondents' motion for summary judgment, concluding that a penetrative cavity search of a pretrial detainee requires only reasonable suspicion. The Seventh Circuit agreed. "[G]iven the heft of the security interest at stake," it reasoned, "the invasion to [Brown's] privacy was not so . . . grea[t] that it pushes the threshold suspicion requirement into probable cause." 965 F. 3d 534, 540 (2020).

---

[1] Because it is irrelevant to the question presented, there is no need to address whether these tips in fact provided reasonable suspicion.

II

The Seventh Circuit nowhere considered whether something less intrusive than "prying open [Brown's] vagina and anus" was sufficient to ensure jail security. *Id.*, at 541. That was error. The necessity of a search and its extent cannot be determined in a vacuum. It must instead "be judged in light of the availability of . . . less invasive alternative[s]." *Birchfield* v. *North Dakota*, 579 U. S. ___, ___ (2016) (slip op., at 33). When such an option exists, the State must offer a "satisfactory justification for demanding the more intrusive alternative." *Ibid.* See also *Florida* v. *Royer*, 460 U. S. 491, 500 (1983) ("[T]he investigative methods employed should be the least intrusive means reasonably available to verify or dispel the officer's suspicion").

This Court has thus held, for example, that the availability of a breath test to determine a suspect's blood alcohol content makes a blood draw for that purpose unreasonable, absent a warrant or exigent circumstances. *Birchfield*, 579 U. S., at ___ (slip op., at 33). Two Members of this Court have underscored the importance of considering less intrusive alternatives in the context of searching pretrial detainees. See *Florence* v. *Board of Chosen Freeholders of County of Burlington*, 566 U. S. 318, 341–342 (2012) (ALITO, J., concurring) ("[A]dmission to the general jail population, with the concomitant humiliation of a strip search, may not be reasonable" for those who will soon be released, "particularly if an alternative procedure is feasible," such as separating "minor offenders from the general population"); *id.,* at 340 (ROBERTS, C. J., concurring) (emphasizing that "there was apparently no alternative" to housing the arrestee with the general population).

This is a sensible rule, particularly where, as here, the State seeks a categorical exception to the Fourth Amendment's warrant requirement. If courts permit extraordinarily intrusive searches of pretrial detainees without a warrant, correctional officers may abandon less invasive,

but more burdensome, practices. Likewise, if officers are free to decide for themselves if they have the requisite degree of suspicion, some may cross the line, even if in perfectly good faith.[2] See *Brinegar* v. *United States*, 338 U. S. 160, 182 (1949) (Jackson, J., dissenting) ("We must remember that the extent of any privilege of search and seizure without warrant which we sustain, the officers interpret and apply themselves and will push to the limit"). The consequences will be borne by both the innocent and the guilty.

Consider Polk County Jail. Its official policy was to perform penetrative searches of pretrial detainees' vaginal and anal cavities based on mere reasonable suspicion. In practice, both Hilleshiem and Revels believed that even the barest accusations met that standard, with no corroboration needed. But see, *e.g., Alabama* v. *White*, 496 U. S. 325, 330 (1990) ("[I]f a tip has a relatively low degree of reliability, more information will be required to establish the requisite quantum of suspicion"). Anyone could have suffered the indignity of this practice. "If an officer has probable cause to believe that an individual has committed even a very minor criminal offense in his presence, he may, without violating the Fourth Amendment, arrest the offender." *Atwater* v. *Lago Vista*, 532 U. S. 318, 354 (2001). Meanwhile, "criminal laws have grown so exuberantly and come to cover so much previously innocent conduct that almost anyone can be arrested for something." *Nieves* v. *Bartlett*, 587 U. S. \_\_\_, \_\_\_–\_\_\_ (2019) (GORSUCH, J., concurring in part and dissenting in part) (slip op., at 1–2). An unbuckled seatbelt, a noisy muffler, an unleashed dog: Any one of countless petty misdemeanors might land you in jail. See *Florence*, 566 U. S., at 346–347 (BREYER, J., dissenting). Polk County did not distinguish between detainees. An unverified charge

———————

[2] That said, "the authority which we concede to conduct searches and seizures without [a] warrant may be exercised by the most unfit and ruthless officers as well as by the fit and responsible." *Brinegar* v. *United States*, 338 U. S. 160, 182 (1949) (Jackson, J., dissenting).

from a stranger with unknown motives could send anyone to the hospital for a penetrative search, just like Brown.[3]

Given the degrading nature of the search in this case, less invasive possibilities abound. The court below did not address the option of a solely visual search, see *id.*, at 322, or multiple visual searches over time. Prison officials could order an X ray or transabdominal ultrasound, as occurred here. They could isolate the detainee and investigate further to obtain probable cause. They could await a monitored bowel movement. See *United States* v. *Montoya de Hernandez*, 473 U. S. 531, 534–535, 541, and n. 4 (1985) (upholding prolonged detention of a traveler at the border reasonably suspected of smuggling contraband in her body); *United States* v. *Booker*, 728 F. 3d 535, 547 (CA6 2013) (discussing Customs and Border Patrol policy to first "attempt an x-ray," then "engage in a monitored bowel movement," and "only engage in an involuntary body cavity search after obtaining a court order"). There are likely many other less invasive options worth considering.

Some of these searches would be, to different degrees, less effective than that performed here. As discussed above, this is not the case to decide whether a penetrative cavity search is necessarily unreasonable in light of these potential alternatives. Going forward, however, courts must consider less intrusive possibilities before categorically allowing warrantless searches. This obligation weighs particularly heavily for dehumanizing searches of pretrial detainees like that which Brown endured here.

———————

[3] People of color disproportionately bear these burdens. Brown is a member of the Fond du Lac Band of Lake Superior Chippewa. ECF Doc. 17, p. 17. Native American people are vastly overrepresented in Wisconsin jails and prisons. See Brief for National Alliance to End Sexual Violence et al. as *Amici Curiae* 12–13. Native American women, meanwhile, "experience sexual violence at higher rates than any other population in the United States." *Id.,* at 14. Consequently, "non-consensual body cavity searches are more likely to traumatize and retraumatize" Native American women and their communities. *Ibid.*