In the

# United States Court of Appeals

## For the Seventh Circuit

————————

No. 23-3091

RAQUEL HARO,

*Plaintiff-Appellant,*

*v.*

PORTER COUNTY, INDIANA, DARROLYN S. BRADLEY, and PORTER
COUNTY SHERIFF'S DEPARTMENT,

*Defendants-Appellees.*

————————

Appeal from the United States District Court for the
Northern District of Indiana, Hammond Division.
No. 2:21-CV-131-TLS — **Theresa L. Springmann**, *Judge.*

————————

ARGUED OCTOBER 24, 2024 — DECIDED FEBRUARY 24, 2025

————————

Before EASTERBROOK, KIRSCH, and PRYOR, *Circuit Judges.*

KIRSCH, *Circuit Judge.* After being arrested at a college
party, Raquel Haro was subjected to a strip search, including
a visual cavity inspection, during the booking and intake pro-
cess at Porter County Jail. As a security measure, the jail has
all arrestees pass through a body scanner. Jail officials singled
out Haro for a strip search because her body scan revealed a
small, unidentified object in her pelvic region. Haro concedes

that the scan gave rise to reasonable suspicion of concealed contraband and thus justified a strip search. But she maintains that reasonable suspicion vanished mid-strip search when it was revealed that she wore a bodysuit that fastened between her legs with metal snaps. According to Haro, continuing the strip search after this point was unreasonable and unlawful.

Haro sued Porter County, the county sheriff's department, and the officer who conducted the search under 42 U.S.C. § 1983, alleging that the strip search violated her rights under the Fourth and Fourteenth Amendments. The district court granted the defendants' motion for summary judgment, concluding that the strip search was both justified and reasonable in scope. We agree and affirm.

I

Shortly after midnight, police arrived at a duplex apartment in Valparaiso, Indiana, to investigate a noise complaint. Raquel Haro lived in the apartment along with two roommates. One of Haro's roommates was hosting a party to celebrate his fraternity's new inductees. Though some party attendees were under 21, Haro was of legal drinking age and was in the kitchen making cookies when police arrived. Officers requested the names of everyone on the lease and ultimately arrested Haro and her roommates on suspicion of furnishing alcohol to minors. Haro later testified that she had never been arrested before.

Officers transported Haro and her roommates to Porter County Jail, where they went through a body scanner as part of the booking process. The jail had recently acquired a Soter RS Body Scanner, which can reveal concealed objects that are of a different density than human tissue, including metal,

weapons, and narcotics. Haro signed a waiver indicating that she had no health conditions that would make a scan unsafe but denies being asked whether she had anything on her body that might show up on the scan.

When she arrived at the jail, Haro was wearing a sweat-shirt, jeans, a bodysuit, and undergarments. The bodysuit, which Haro wore under her jeans, fastened between her legs with two small metal snaps. The snaps appeared on the body scan as a single, dark, oval-shaped object in Haro's pelvic region. After viewing the scan, the supervising officer, Sergeant William Watkins, ordered a female officer, Officer Darrolyn Bradley, to perform a strip search of Haro. Both Sgt. Watkins and Officer Bradley knew that some women's bodysuits have metal snaps between the legs, but no one mentioned the anomaly on the scan to Haro, and Haro did not inform the officers that she had metal in her pelvic area.

Pursuant to jail policy, Haro's strip search took place in a separate shower room, with only Officer Bradley and Haro present. Officer Bradley instructed Haro to take off each piece of clothing one-by-one and hand it to her. Haro did not ask any questions but did tell Officer Bradley that she was wearing a bodysuit and would need to remove her pants before she could take it off. Once Haro was naked, Officer Bradley instructed her to bend over and spread her butt cheeks as Bradley made a brief visual inspection of Haro's body cavities. The entire search took between 5 and 10 minutes, and Haro was bent over for approximately 10 to 20 seconds. Immediately after the search, Officer Bradley instructed Haro to shower, gave her a uniform, and placed her in a holding cell with two other women. Haro bonded out shortly after and never entered the jail's general population.

Haro brought a § 1983 suit against Porter County, the Porter County Sheriff's Department, and Officer Bradley, claiming that the strip search violated her rights under the Fourth and Fourteenth Amendments.[*] The district court granted the defendants' motion for summary judgment, finding that the strip search was adequately justified and not unreasonable in scope. This appeal followed.

II

To prevail on a § 1983 claim, a plaintiff must prove that she was deprived of a federal or constitutional right by an individual acting under color of state law. *Bohanon v. City of Indianapolis*, 46 F.4th 669, 675 (7th Cir. 2022). Section 1983 liability can also extend to local governing entities if the entity's official policies or widespread practice caused the deprivation. *Monell v. Dep't of Soc. Servs. of N.Y.C.*, 436 U.S. 658, 690–91 (1978). We review a district court's grant of summary judgment de novo, viewing the facts in the light most favorable to the non-movant and drawing reasonable inferences in her favor. *Brown v. Polk Cnty.*, 965 F.3d 534, 538 (7th Cir. 2020).

Strip searches that expose an individual's bare body and genitals are an "extraordinary interference with privacy." *Id.* at 540. Accordingly, the government's authority to conduct strip searches of arrestees is limited by the Fourth Amendment, which guarantees the "right of the people to be secure in their persons … against unreasonable searches and seizures."

---

[*] On appeal, Haro concedes Porter County has no authority under state law to control acts performed by the sheriff and is therefore not a proper defendant in this case.

The "touchstone" of the Fourth Amendment inquiry is reasonableness. *Samson v. California*, 547 U.S. 843, 855 n.4 (2006). Reasonableness will often turn on whether "some quantum of individualized suspicion" justified a search. *United States v. Martinez-Fuerte*, 428 U.S. 543, 560 (1976). But recognizing that detention facilities are a "unique" context "fraught with serious security dangers," the Supreme Court has held that jails may sometimes enforce suspicionless strip search policies. *Bell v. Wolfish*, 441 U.S. 520, 558–60 (1979) (upholding policy requiring all inmates to undergo strip searches when they return from contact visits); *Florence v. Bd. of Chosen Freeholders of Cnty. of Burlington*, 566 U.S. 318, 330 (2012) (upholding policy of strip searching all pretrial detainees bound for the jail's general population).

But these suspicionless search precedents do not "declare detainees' bodies open for search at any time and under any circumstance." *Brown*, 965 F.3d at 539. *Florence* and *Bell* dealt with suspicionless strip search policies that applied universally. When a jail instead singles out individual detainees for strip searches, we have held that such searches must be justified by reasonable suspicion. See *id.*; *United States v. Freeman*, 691 F.3d 893, 901 (7th Cir. 2012); cf. *Fonder v. Sheriff of Kankakee Cnty.*, 823 F.3d 1144, 1146 (7th Cir. 2016) (rejecting the assumption that "the power [under *Florence*] to conduct a strip search of every arrestee implies the lesser power to inspect a subset of all arrestees"). Porter County Jail does not conduct suspicionless strip searches of all arrestees—only those who are bound for the jail's general population. And arrestees who, like Haro, are expected to bond out are placed in holding cells (for which strip searches are normally not required) rather than the jail's general population. Under these circumstances, jail officials needed reasonable suspicion to single out

Haro for a strip search. But our Fourth Amendment inquiry does not end there. In assessing the reasonableness of a search, we "consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted." *Kraushaar v. Flanigan*, 45 F.3d 1040, 1045 (7th Cir. 1995) (quoting *Bell*, 441 U.S. at 559).

### A

On appeal, Haro concedes that the anomaly on the scan gave rise to reasonable suspicion of concealed contraband and justified the initiation of a strip search. She objects, however, to the scope of the search, arguing that reasonable suspicion dissipated the moment Officer Bradley had the opportunity to observe the metal snaps on the body suit. After this point, Haro argues, it was unreasonable for Officer Bradley to proceed with the most intrusive and humiliating steps of the search (the visual inspection of Haro's naked body and body cavities).

### 1

We are unaware of any case in which a court has found that reasonable suspicion was dispelled partway through a strip search. Acknowledging that this is likely a novel factual scenario, Haro analogizes to reasonable suspicion cases from other contexts and relies on the general principle that "the purposes justifying a police search strictly limit the permissible extent of the search." *Maryland v. Garrison*, 480 U.S. 79, 87 (1987); see also *Terry v. Ohio*, 392 U.S. 1, 18–19 (1968). But the cases on which Haro relies are inapposite.

Haro cites multiple district court cases in which reasonable suspicion of contraband dissipated after a preliminary

search turned up empty. By contrast, the cavity inspection conducted by Officer Bradley was not a secondary or separate search—it was simply one part of a single strip search. And the body cavity inspection was in no way untethered to the original justification for the strip search. The scan gave rise to reasonable suspicion that Haro was concealing contraband in a body cavity, and it was reasonable to perform the visual cavity search to confirm or dispel that suspicion.

Nor is Haro correct to analogize this situation to *United States v. Bey*, 911 F.3d 139 (3d Cir. 2018), in which new information conclusively dispelled reasonable suspicion. *Id.* at 145–47. In *Bey*, officers were presented with incontrovertible evidence that they had stopped the wrong man once he turned around and they could see his face. See *id.* at 142 (observing that Bey was darker skinned, 30 to 40 pounds heavier, a decade older, and had far more facial hair than the suspect officers were pursuing). By contrast, the revelation that Haro wore a bodysuit did not compel the conclusion that she carried no contraband. As a preliminary matter, it is unclear whether Officer Bradley noticed the metal snaps during the strip search. Haro contends there was plenty of opportunity to observe the snaps when she removed the bodysuit and handed it to Officer Bradley. But it would not have been unreasonable to overlook them; Officer Bradley was looking for contraband, not innocuous parts of clothing that might be mistaken for contraband. Even if Officer Bradley noticed the snaps and thought it possible that they accounted for the anomaly on the scan, she could hardly have been certain. On the bodysuit, the snaps appear as two distinct metal circles separated by fabric. The scan, however, showed a single, larger, oval-shaped object. Haro maintains that the dark spot was undoubtedly the snaps, because they were metal and yet

show up nowhere else on the scan. But Officer Bradley was not required to make this connection mid-strip search. An officer cannot be expected to simultaneously conduct a careful search for contraband while also mentally comparing every zipper, snap, and button she encounters against a body scan image she has committed to memory.

2

We also stress that this was a search conducted in a jail, a unique setting in which we accord officials "wide-ranging deference" to design search policies needed "to maintain institutional security." *Bell*, 441 U.S. at 547. In practice, this means we defer to officials' judgment that a given search policy is "reasonably related to legitimate security interests" absent "substantial evidence in the record to indicate that the officials have exaggerated their response to these considerations." *Florence*, 566 U.S. at 328 (quotation omitted).

Haro contends that a general policy requiring jail officials to complete each and every step of a strip search once it has begun is unreasonable. There is some dispute as to what exactly Porter County Jail's policy required, and though we think it would be the rare case where such a policy would prove unreasonable, we need not resolve that issue today. It was not unreasonable for Officer Bradley to continue this strip search when uncertainty as to the presence of contraband persisted. "Detecting contraband concealed by new detainees [] is a most serious responsibility. Weapons, drugs, and alcohol all disrupt the safe operation of a jail." *Id.* at 332. Completing every step of a strip search lessens the likelihood that detainees might successfully smuggle in contraband. Indeed, the company that makes the Soter RS Body Scanner cautions against assuming that objects on the scan are clothing, as

inmates may try to evade detection of contraband by deliberately concealing it behind metal items or fasteners. Haro counters that she had little motive or opportunity to conceal contraband in this way. We don't doubt her, but jails pose unique security challenges precisely because officials "know so little about the people they admit." *Id.* at 336; see also *id.* at 336–37 ("[O]fficers who conduct an initial search often do not have access to criminal history records.… In the absence of reliable information it would be illogical to require officers to assume the arrestees in front of them do not pose a risk of smuggling something into the facility.") (citation omitted).

The fact that Porter County Jail employs a body scanner does not alter our Fourth Amendment analysis. It's true that, in Haro's case, officers could have conclusively dispelled their reasonable suspicion without a visual cavity inspection. Had officers realized Haro was wearing a bodysuit with metal snaps, it might have been prudent to ask her to remove it and go through the scanner again. But doing so was not constitutionally required. A jail's choice to employ a body scanner does not subject its use of strip searches to heightened constitutional scrutiny. And courts should be wary of dictating how and when jail officials must use the various screening tools at their disposal. A rule that requires officers to halt mid-strip search and attempt to dispel reasonable suspicion by rescanning arrestees could easily prove problematic in practice. It may make it difficult to efficiently usher arrestees through the intake process, particularly in small jails where personnel and equipment are limited. It could also lead to prolonged or repeated strip searches in cases where reasonable suspicion persists even after a second scan. As these considerations illustrate, "the problems that arise in the day-to-day operation of a corrections facility are not susceptible of easy solutions."

*Bell*, 441 U.S. at 547. Where, as here, jail officials have struck a reasonable balance between safety, administrability, and privacy, we will not disturb their judgment.

B

Officer Bradley did not exceed the permissible scope of the search by completing every step of the strip search process, including the visual cavity inspection. Nor is there any suggestion that Officer Bradley otherwise carried out the search in an unreasonable manner: it is undisputed that she conducted the search in a private area with no one else present, that the inspection was visual only, and that she moved through the steps of the search swiftly—particularly the body cavity inspection, which lasted only 10 to 20 seconds. Of course, even the most efficient strip search is still a significant invasion of privacy, and we do not minimize what was undoubtedly a distressing and unpleasant experience for Haro. But given the facts presented here, no rational jury could conclude that Officer Bradley's actions violated the Fourth Amendment. Because Officer Bradley's actions were not unconstitutional, we need not consider her qualified immunity defense. And in the absence of any underlying constitutional violation, there is no liability for the Porter County Sheriff's Department under *Monell*. See *Swanigan v. City of Chi.*, 775 F.3d 953, 962 (7th Cir. 2015).

AFFIRMED